IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


MARAH O. HEMPHILL,

       Plaintiff,

   -vs-                                           No. Civ. 10-0861 LH/RHS

LIBERTY MUTUAL INSURANCE COMPANY,

       Defendant.


MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims of Breach of Contract, Bad Faith and Statutory Violations ("Motion for Partial Summary Judgment") (Docket No. 52), filed January 30, 2012.  The Court, having reviewed the Motion, the accompanying memoranda, and the applicable law, and otherwise being fully advised, finds that the  Motion is well taken in part and it will be **granted in part and denied in part**.


Plaintiff Marah O. Hemphill initiated this action on August 10, 2010, filing her Complaint to Recover Damages for Personal Injury and Bad Faith Insurance Practices ("Complaint') (Docket No. 1-1), in the First Judicial District Court, County of Santa Fe.  Defendant Liberty Mutual Insurance Company ("Liberty Mutual"),[1] removed the case to federal court on September 16, 2010,

---

[1]    Defendant states in its Notice of Removal that "[t]he policy that is the subject of this lawsuit was actually issued by LM Property and Casualty Insurance Company."  (Docket No. 1), filed Sept. 16, 2010, ¶ 8.  The Answer to Complaint for Personal Injury and Bad Faith Insurance Practice ("Answer") and subsequent defense submissions, are brought by "LM Property and Casualty Insurance Company, formerly known as Prudential Property and Casualty Insurance Company, and on behalf of the entity named in Plaintiff's Complaint as Defendant 'Liberty Mutual Insurance

asserting diversity jurisdiction, pursuant to 28 U.S.C. § 1332.  Plaintiff alleged two causes of action in her Complaint: Count I, "Negligence/ Negligence Per Se,"[2]  and Count II, "Breach of Contract/Breach of Covenant of Good Faith and Fair Dealing and Statutory Violations."  In Count II she asserts that by its refusal to pay any amount of her underinsured motorist claim, Liberty Mutual is in breach of contract and has violated the covenant of good faith and fair dealing inherent in the insurance contract under New Mexico law.  She further contends that Defendant violated the Trade Practices and Frauds Act of the Insurance Code ("Unfair Claims Practices Act"), N.M. STAT. ANN. § 59A-16-20, and the New Mexico Unfair Practices Act, *see generally,* N.M. STAT. ANN. §§ 57-12-1 to -16.  Liberty Mutual moves for partial summary judgment on each of the claims in Count II.

STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, pursuant to Rule 56, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.  "All facts and reasonable inferences, however, must be construed in the light most favorable to the

---

Company.'"  *See, e.g.,* Answer (Docket No. 3), filed Sept. 30, 2010, at 1.  As Defendant has only recently filed a motion to correct its name, *see* Mot. Modification Interlineation (Docket No. 103), filed Mar. 12, 2013, which Motion is opposed by Plaintiff, the Court will address the Defendant as named in the caption: Liberty Mutual Insurance Company ("Liberty Mutual").

[2]   The Court previously granted Defendant's Motion to Dismiss Plaintiff's Negligence and Negligence Per Se Claims, *see* Memo. Op. (Docket No. 99), filed October 23, 2012, thereby dismissing Count I of the Complaint.

nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted).

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.*; *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson*, 477 U.S. at 248.

## FACTUAL BACKGROUND

In an unusual proffer, particularly given the complexity of the underlying accident and subsequent events, Liberty Mutual offers only "Four Undisputed Material Facts" (Def.'s "UMF") in support of its Motion for Partial Summary Judgment:

1. After settling with the insurers of Germann[3] and Browning, Plaintiff sent LM Property a demand for $325,000 on November 10, 2008.

2. Twenty-three days later, on December 3, 2008, LM Property adjuster Travis Flowers informed Plaintiff's attorney that Plaintiff had been "fully compensated for her injuries from the total settlements she received to date."

3. Plaintiff's insurance expert, Garth Allen, testified that LM Property adopted adequate standards as described in its 2008 bodily injury claims investigation handbook.

---

[3] Plaintiff spells this name "German." The Court will use Plaintiff's spelling, except when quoting Defendant's materials with the spelling "Germann."

4.  In evaluating Plaintiff's claim, LM Property determined it was entitled to a total offset of $150,000.  It also decided that Plaintiff had been fully compensated for her injuries from the total settlements she received to date.  Therefore, LM Property necessarily decided that Plaintiff's total damages from this accident totaled $150,000 or less.

Def.'s Mot. Part. Summ. J. 4 (citations omitted) (internal quotation marks omitted).

Plaintiff does not dispute Defendant's first three factual statements.  Pl.'s Mem. Opp'n (Docket No. 72), filed Mar. 9, 2012, at 5.  As to Defendant's fourth fact, Plaintiff disputes that Liberty Mutual determined the value of her total damages and that Liberty Mutual informed her that it would assert a $25,000 offset for the advanced medical payments.  *Id.* at 5.  She then proceeds to list forty-nine "additional material facts."[4]  *Id.*, Pl.'s Statement Additional Material Facts ("Pl.'s AMF"), at 5-11.

Despite the parties' failure to set forth and properly support the relevant background underlying this matter, the facts, for the most part, are not in dispute.  *See* Compl. 1-8, "General Allegations" ¶¶ 5-14; Answer (Docket No. 3), filed Sept. 30, 2010, ¶¶ 5-14; Def.'s Mot. Part. Summ. J. 3-4, "Relevant Factual Background"; Pl.'s Mem. Opp'n 3-5, "Marah Hemphill's Underinsured Motorist Claim."  Plaintiff was involved in a multiple-car accident while driving herself and three passengers to high school on August 19, 2004.  Four vehicles were involved in rear-end collisions.  Ms. Hemphill was driving behind the first automobile, which suddenly came to an abrupt halt.  The third car, driven by Lina German, hit Ms. Hemphill's vehicle, causing it to collide with the first car.[5]

[4] The Court notes that while Defendant generally states that it disputes certain of Plaintiff's additional material facts, Def.'s Reply 2, it does not support this assertion by "citing to particular parts of materials in the record," as required by Fed. R. Civ. P. 56(c), or even discussing what its objections are.  Defendant does broadly object that Plaintiff does not identify why any of her additional facts are material and that she does not mention most of them in her Response.  Def.'s Reply 2.

[5] Liberty Mutual disputes whether Ms. Hemphill first hit the car in front of her when it stopped suddenly or was pushed into the LeBlanc vehicle by Ms. German.  Def.'s Mot. Part. Summ. J. 3.  Defendant similarly questions whether the Browning car caused Ms. German to again hit Plaintiff's vehicle.  *Id.*  These determinations are not material to the analysis of this Motion.

4

The fourth vehicle, driven by Jack Browning, hit Ms. German's car, which apparently again rear-ended Ms. Hemphill.  Having sustained neck and back injuries, Plaintiff was transported by ambulance to a hospital.  After more than two years of treatment, she had incurred medical costs in excess of $45,000.

With the consent of her insurer, Defendant Liberty Mutual, Ms. Hemphill subsequently settled all of her claims against Ms. German for $25,000, the sum of Ms. German's policy limits with her insurer, Allstate.  Plaintiff filed suit against Mr. Browning and eventually settled her claims against him for $78,500, less than his policy limits of $100,000 with his insurer Met-Life, again with Defendant's approval.  Including a payment from Liberty Mutual of $25,000 under the MedPay provisions of her policy, Ms. Hemphill received compensation totaling $128,500.

On November 10, 2008, Plaintiff sent a demand letter, under the Uninsured/Underinsured Motorist provisions of her policy, to Liberty Mutual.  She claimed that the value of the injuries she had incurred because of the accident was $450,000 and, offsetting that amount by $125,000 (the sum of Ms. German's and Mr. Browning's policy limits), she demanded payment of $325,000.  On December 3, 2008, Travis Flowers, an adjuster for Defendant, informed Plaintiff that Liberty Mutual disagreed, concluding that Ms. Hemphill had been fully compensated by amounts she had recovered from Allstate, Met-Life, and Liberty Mutual.  Plaintiff then filed this suit in New Mexico State Court, and Liberty Mutual removed it to this Court.

## BREACH OF CONTRACT CLAIM

Liberty Mutual first moves for summary judgment on Plaintiff's breach of contract claim. In her Complaint, Ms. Hemphill alleges that Liberty Mutual breached its contractual obligations under her insurance policy by its "refusal to pay any amount to Plaintiff in connection with her

underinsured motorist claim, when there was and is in excess of $1.0 million in coverage available to pay Plaintiff."  Compl. ¶20.

An insurance policy is a contract between the insurer and the insured.  *See, e.g., Modisette v. Found. Reserve Ins. Co.*, 77 N.M. 661, 666, 427 P.2d 21, 25 (1967).  Thus, an insurer "may breach a contract by failing to perform a contractual obligation when that performance is called for . . . or announcing ahead of time that [it] will not perform a contractual obligation when the time for that performance comes due."  New Mexico Uniform Jury Instructions–Civil ["NMUJI"] § 13–1702 13-822.

Liberty Mutual argues that it should be granted summary judgment on Plaintiff's breach of contract claim because under the insurance policy it could value a claim at $0 and the policy contains no provision that Defendant agreed always to make a payment on underinsured motorist claims.  Liberty Mutual maintains that it met the terms of the insurance contract by paying Ms. Hemphill $25,000 in MedPay, which it also agreed not to subrogate even though she collected an additional $103,500 from Ms. German's and Mr. Browning's insurers.  Additionally, Liberty Mutual contends that given its valuation of Plaintiff's claim at $150,000 or less and her demand for $325,000, it is irrelevant that her policy limit was $1 million..

Plaintiff responds that even in the absence of a claim of bad faith, whether Liberty Mutual breached the insurance contract is relevant and is merely a question of whether Defendant has breached the contract by not paying underinsured motorist benefits to her.  Pl.'s Mem. Opp'n 12. Citing to the policy, Ms. Hemphill explains, and Defendant does not contest, that

> Liberty Mutual agreed to pay up to its limit of liability for bodily injury when an insured's car is struck by an underinsured vehicle.  Liberty Mutual's payment is based on the amount the insured is legally entitled to recover for the bodily injury but could not collect from the operator of the underinsured motor vehicle. The policy provides that an operator responsible for the accident is underinsured if his or her

> liability insurance has lower limits than the [underinsured motorist] limits of the insured under the Liberty Mutual policy.  Plaintiff had at least $1 million in [underinsured motorist] coverage.  Ms German had $25,000 limits on her liability policy.  Mr. Browning had $100,0000 limits on his liability policy.  Under the language of the policy both of them are underinsured operators of vehicles.  Thus, Plaintiff's car was struck by an underinsured vehicle.

*Id.* (internal citations omitted) (citing Pl.'s AMF 35-39 at pp. 9-10 and Ex. 8); Def.'s Reply 2.

Plaintiff then, rather inartfully, frames the dispute as centering on "whether she was legally entitled to recover for bodily injury from either or both of the other two drivers which she could not collect from the operator of the underinsured vehicle."  Pl.'s Mem. Opp'n 12.  She maintains that in order to answer this question, Liberty Mutual had to determine the legal liability of each of the other drivers by applying the doctrine of pure comparative negligence and allocating the "percentage of fault applied to total damages."  *Id.* at 12-13.  Plaintiff then asserts that because Travis Flowers, Liberty Mutual's claim adjuster, did not conduct this analysis, a genuine issue of material fact exists as to whether Liberty Mutual owes her money.  *Id.* at 13.  Plaintiff also argues that varying computations of the total damages she incurred as a result of the accident[6] and differing percentages of fault assigned to herself, Ms. German, and Mr. Browning,[7] along with the absence of any calculations and analysis by Mr. Flowers or his supervisor Alice Parisot, show the existence of genuine issues of material facts precluding summary judgment "on her breach of contract claim for

---

[6]     Ms. Hemphill provides the following examples:  Mr. Flower's conclusion in 2008 that $150,000 was full compensation; the extrapolation of $314,000 derived from the 2008 evaluation by MetLife's defense counsel; $425,000 arrived at by Ms. Hemphill's counsel in December 2008; and Plaintiff's expert Janet Toney's estimate of lifetime medical and related costs of $990,897.  Pl.'s Mem. Opp'n 13.  The Court notes that except for Ms. Toney's calculation, *see* Notice Filing Exs. . . . to Pl.'s Resp. to Def.'s *Daubert* Mot. Exclude Testimony  Pl.'s Expert Garth Allen [Doc 71] (Docket No. 73), filed Mar. 12, 2012, Ex. 3, Plaintiff fails to cite any exhibits supporting these numbers or explaining how they were calculated.

[7]     Plaintiff lists the following:  "0% fault on Hemphill from Mr. Bartell [counsel hired by MetLife for Mr. Browning]; 50% fault on Ms. German with respect to the property damage settlement reached with Ms. Le Blanc; 25% fault on Mr. Browning and 75% fault on Ms. German arrived at by MetLife's defense counsel for Plaintiff's damages; 50% fault on Mr. Browning for Plaintiff's injuries as stated by MetLife adjuster on June 12, 2007."  Pl.'s Mem. Opp'n 13, citing Pl.'s AMF 26, 27, 28 ,42.

failure to pay benefits due." *Id.* In sum, Plaintiff maintains that summary judgment on her breach of contract claim is inappropriate whether the other drivers' underinsured status is determined using a comparative fault analysis, as she contends it should be, or in the aggregate, as she describes Liberty Mutual's argument.

Liberty Mutual replies that Plaintiff's breach of contract claim is unsupported by material facts. Stating that there is no dispute that the parties had an insurance contract which provided that Liberty Mutual's "payment is based on the amount that an insured is legally entitled to recover for bodily injury . . . but could not collect from the owner or operator of the uninsured or underinsured motor vehicle," Def.'s Reply 2 (citing Pl.'s Mem. Opp'n, Pl.'s AMF 35), and that it determined that Plaintiff "had been fully compensated for her injuries from the total settlements she received to date," *id.* at 2-3 (citing Def.'s Mot Part. Summ J., Def.'s UMF 2), Defendant concludes that the contract was not breached. Liberty Mutual continues that the contract did not say that it "would pay Plaintiff some amount of money no matter what, that it would pay Plaintiff more if her policy limit was higher or that it would allocate specific percentages of liability in a motor vehicle accident," and maintains that "[a]ny such facts are immaterial and should be disregarded." *Id.* at 3.

To the extent that Plaintiff's breach of contract claim is read as a bare allegation that Liberty Mutual is in breach merely because it refused to pay her anything for her underinsured motorist claim when there was at least $1 million dollars in coverage available, as Plaintiff can be argued to have pled in her Complaint[8] and Defendant has framed its Motion, it must be dismissed. Obviously, the amount due under the policy to Plaintiff, if any, is not established by the amount of underinsured

---

[8]   "Liberty Mutual's refusal to pay any amount to Plaintiff in connection with her underinsured motorist claim, when there was and is in excess of $1.0 million in coverage available to pay Plaintiff is contrary to its obligations under the Policy and constitutes a breach of contract." Compl. ¶ 20.

motorist coverage available.  Rather, as the New Mexico Supreme Court has stated, "an insured collects from h[er] underinsured motorist carrier the difference between h[er] uninsured motorist coverage and the tortfeasor's liability coverage or the difference between h[er] damages and the tortfeasor's liability coverage, *whichever is less*."  *Schmick v. State Farm Mut. Auto. Ins. Co.*, 103 N.M. 216, 218, 222, 704 P.2d 1092, 1094, 1098 (1985) (emphasis added).  Thus, Ms. Hemphill's recovery cannot exceed her total damages, regardless of the amount of underinsured motorist coverage she may carry.  *Id.* at 218 n.1, 704 P.2d at 1094 n.1 ("[T]he combined amounts the insured recovers from h[er] underinsured motorist insurance carrier and the tortfeasor's libility insurer can never exceed the insured's total damages."); *State Farm Mut. Auto. Ins. Co. v. Safeco Ins. Co.*, Docket No. 33,622, at *3 (N.M. Feb. 21, 2013) (limits of insured's underinsured motorist recovery is "the lesser of the insured's total damages or the insured's total stacked UIM coverage, minus the tortfeasor's liability coverage").

The Court will not construe Plaintiff's breach of contract claim so narrowly, however. Clearly, Ms. Hemphill claims that she has not been fully compensated for her damages, while Liberty Mutual contends that she has. This is the breach of contract claim that remains and Ms. Hemphill bears the burden of proving her damages, the amount she is legally entitled to recover for bodily injuries, at trial.[9]

BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM

Ms. Hemphill alleges that by its "refusal to pay any amount to Plaintiff in connection with her underinsured motorist claim, when there was and is in excess of $1.0 million in coverage

---

[9]  The Court feels compelled to comment that Plaintiff cannot prove her bodily injury damages by means of extrapolation and the fault allocations determined by the insurers of the other drivers involved in the accident are not binding on Defendant or the Court and have little, if any, relevance to this proceeding. *See, e.g.,* Pl.'s Mem. Opp'n 13.

9

available to pay Plaintiff," Liberty Mutual also violated the covenant of good faith and fair dealing inherent in insurance contracts under New Mexico law.  Compl. ¶20.  An implied covenant of good faith and fair dealing protects against "bad faith or wrongful and intentional conduct that injures the other party's rights under the contract."  *Azar v. Prudential Ins. Co. of Am.*, 133 N.M. 669, 687, 68 P.3d 909, 927 (N.M. Ct. App. 2003).  As applied to insurance contracts, the covenant dictates that the insurer "not injure its policyholder's right to receive the full benefits of the contract, [or m]ore specifically, . . . that an insurer cannot be partial to its own interests, but must give its interests and the interests of its insured equal consideration."  *Dairyland Ins. Co. v. Herman*, 124 N.M. 624, 628-29, 954 P.2d 56, 60-61 (1997) (internal quotation marks and citations omitted).  Accordingly, "in New Mexico, an insurer acts in bad faith when it denies a first party claim for reasons that are frivolous or unfounded."  *Am. Nat'l Prop. and Cas. Co. v. Cleveland*, 293 P.3d 954, 958 (N.M. Ct. App. 2012) (citing *Sloan v. State Farm Mut. Auto. Ins. Co.*, 135 N.M. 106, 109, 112, 85 P.3d 230, 233, 236 (2004)).

"Unfounded" is synonymous with "frivolous," and is defined as "the failure to exercise care for the interests of the insured, an arbitrary or baseless refusal to pay, lacking support in the language of the policy or the circumstances of the claim."  *Id.* (citing *Sloan*, 135 N.M. at 113, 85 P.3d at 237).  More specifically, "it means essentially the same thing as 'reckless disregard,' in which the insurer '*utterly* fail[s] to exercise care for the interests of the insured in denying or delaying payment on an insurance policy.'"  *Id.* (quoting *Jackson Nat'l Life Ins. Co. v. Receconi*, 113 N.M. 403, 419, 827 P.2d 118, 134 (1992) (alteration in original) (internal quotation marks omitted).

Liability for bad faith, then,

> cannot rest on a merely "erroneous" or "incorrect" refusal. [*Sloan*, 135 N.M. at 112-
> 13, 85 P. 3d at 236-37.]  Where the insurer had a legitimate reason to question the
> amount of damages claimed by the insured, a finding of bad faith is improper.
> *United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 103 N.M. 480, 709 P.2d 649, 654
> (1985); *see also* [NMUJI] § 13–1702.

*Hauff v. Petterson*, 755 F. Supp. 2d 1138, 1145 (D.N.M. 2010).  Thus, to avoid summary judgment on a claim of violation of the duty of good faith, a plaintiff "must cite evidence tending to show that [the insurer's] actions were based on a 'dishonest judgment' and that it 'failed to honestly and fairly balance its own interests' with [those of the insured]."  *Id.* (quoting *Sloan*, 135 N.M. at 113, 85 P.3d at 237).

Liberty Mutual maintains that its reasons for refusing to pay Plaintiff additional money beyond what she already had collected from Ms. German and Mr. Browning were not frivolous or unfounded, but rather, were consistent with New Mexico law.  Given Plaintiff's medical expenses of $46,000, Defendant contends its determination that her claim was worth $150,000 or less was reasonable and legitimate, even if ultimately determined to be incorrect.  Citing *Hauff*, 755 F. Supp. 2d at 1147, where an offer of general damages less than one times medical bills was not found to be unreasonable or the product of bad faith, Liberty Mutual insists that there is no support in New Mexico law that general damages are always at least two times actual medical expenses, as propounded by Plaintiff's bad faith expert, Garth Allen.   Liberty Mutual additionally argues that its decision to offset the sum of the liability limits for the German and Browning policies was the correct method for valuing Ms. Hemphill's claim, as was its decision to offset its own MedPay payment.

Plaintiff responds that Liberty Mutual's reasons for refusing to pay her claim are frivolous or unfounded and that it did not act reasonably under the circumstances to conduct a timely and fair evaluation of her claim.  She contends that a determination of bad faith usually involves an

examination of what is customarily done in the insurance industry and relies on Mr. Allen's opinion of how Liberty Mutual failed to meet industry standards, citing generally to Plaintiff's Response to Defendant's *Daubert* Motion to Exclude Testimony of Plaintiff's Expert Garth Allen (Docket No. 71), filed Mar. 9, 2012, and the exhibits attached thereto.

Liberty Mutual replies that Plaintiff's bad faith claim is unsupported by material facts, as she has provided no factual support whatsoever in her response. Defendant also argues that Plaintiff's reliance on Mr. Allen's opinion that Liberty Mutual did not meet industry standards is insufficient as a matter of law; although industry customs or standards "are evidence of good or bad faith, . . . they are not conclusive," NMUJI 13-1705. Defendant further notes that Plaintiff's belief that Liberty Mutual should pay more, because her underinsured motorist policy limit was at least $1 million, is immaterial, as an adjuster's offer is not made unreasonable or a product of bad faith merely because the insured finds it to be low. *Hauff*, 755 F. Supp. 2d at 1147.

The Court finds that summary judgment should be granted to Defendant on Plaintiff's bad faith claim. First, regardless of what industry customs and standards might be as opined by Mr. Allen, it is clear that New Mexico sets the minimum and the maximum amount an insured can collect from her underinsured motorist insurance carrier as "the difference between h[er] uninsured motorist coverage and the tortfeasor's liability coverage or the difference between h[er] damages and the tortfeasor's liability coverage, whichever is less." *Fasulo v. State Farm Mut. Auto. Ins. Co.*, 108 N.M. 807, 811, 780 P.2d 633, 637 (1989) (quoting *Schmick*, 103 N.M.at 222, 704 P.2d at 1098). This is true "[r]egardless of the number of underinsured tortfeasors at fault," *id.*, and "[t]he *proportionate fault of each* [*tortfeasor*] *is not . . . determinative,*" *id.* at 808, 780 P.3d at 635 (emphasis added). Thus, there is no requirement under New Mexico law that Liberty Mutual determine the comparative liability or underinsured status of Ms. German and Mr. Browning

12

separately.  Indeed, valuing Plaintiff's claim by offsetting the sum of the liability limits of their policies from her damages was the method required under New Mexico law.[10]

Furthermore, given Ms. Hemphill's medical bills of $46,000, Liberty Mutual's valuation of her general damages at $150,000 or less was not unreasonable or unfounded.  *Cf. Hauff*, 755 F. Supp. 2d at 1147 (finding no breach of New Mexico duty of good faith when insurer valued general damages at less than one times medical bills).  Of course, in making this finding, the Court expresses no opinion concerning what the actual amount of general damages owed under the policy, if any, may be.  Also, the Court finds that Plaintiff has offered no support for her conclusory statement that Liberty Mutual did not evaluate her claim in a timely manner.  Ms. Hemphill made her demand upon Liberty Mutual by letter dated November 10, 2008, Def.'s Mot. Partial Summ. J., Ex. C, and Liberty Mutual responded through its Claims Adjuster Travis Flowers by letter dated December 3, 2008, *id.* at Ex. D.  The Court cannot find this time period, a little more than three weeks, in any way untimely or evidence of bad faith on Defendant's part.  *See* Hauff, 755 F. Supp. 2d at 1147 (citing *Reeder v. Am. Econ. Ins. Co.*, 88 F.3d 892, 896 (10th Cir. 1996) (holding under Oklahoma law that an insurer taking just over three months to evaluate a claim and tender a settlement offer was "timely as a matter of law" and "certainly not in bad faith")).

The Court also will grant Defendant summary judgment on Plaintiff's bad faith claim based on the MedPay offset.  Liberty Mutual relies on *Fickbohm v. St. Paul Ins. Co.* as justification for offsetting its $25,000 MedPay payment to Ms. Hemphill.  133 N.M. 414, 63 P.3d 517 (N.M. Ct.

---

[10]   The Court recognizes that there may be an issue as to whether the offset for Mr. Browning's policy should be the full $100,000 liability coverage he carried or the $78,500 Plaintiff actually received.  *See Farmers Ins. Co. of Ariz. v. Sandoval*, 149 N.M. 654, 253 P.3d 944 (Ct. App. 2011).  In *Sandoval*, the court limited the offset "to the amount of liability proceeds actually received."  The insureds in that case, however, received an amount less than the tortfeasor's policy limits due to a contractual exclusion for punitive damages.  That is not the cause of Ms. Hemphill's reduced recovery from Mr. Browning.  Additionally, the offset made by Liberty Mutual predates the *Sandoval* ruling by several years.

App. 2002).  The *Fickbohm* court held that "the [medpay] offset . . . is enforceable in circumstances such as these . . . where the insureds are fully compensated for their damages."  *Id.* at 419, 63 P.3d. at 522.  Besides the insured being fully compensated, another of the  "circumstances" of the cases considered in *Fickbohm*, was that the languages of the policies at issue "mirror[ed] each other and unambiguously express[ed] the intent to impose an offset between the two coverages," the MedPay provisions and the Uninsured Motorist and Underinsured Motorist endorsements.  *Id.* at 416-17, 63 P.2d at 519, 520.

Liberty Mutual states that its policy has similar provisions, but has not provided any citation to the record establishing this assertion.  It does, however, refer to its *Daubert* Motion to Exclude Testimony of Plaintiff's Expert Garth Allen (Docket No. 56), filed January 31, 2012.   The Court takes notice[11] that at his deposition Mr. Allen quoted two portions of the insurance policy relevant to the issues here.   Under the general provisions, titled "No duplication of benefits," the policy states:  "When we pay for damages under any part of this policy, payment will be reduced by any amount payable under any other part of the policy.  No duplicate payments will be paid for the same damages."  *Id.* Ex. B ("Allen Dep.") at 99:16-21.  Similarly, the underinsured/uninsured motorist section of the policy titled "Payments reduced" provides:

> The limit of liability shall be reduced by all sums paid or payable because of bodily injury by or on behalf of persons or organizations who may be legally responsible subject to the each-person-each accident [sic] limit.  This includes all sums paid or payable for bodily injury under any other part of this policy or by other sources such as workers' compensation, disability, or similar loss.

*Id.* at 104:8-17.

---

[11]    Fed. R. Civ. P. 56(c)(3) provides that "[t]he court need consider only the cited materials, but it may consider other materials in the record."

As was the case in *Fickbohm*, "[t]hese two provisions mirror each other and unambiguously express the intent to impose an offset between the two coverages."[12]  133 N.M. at 417, 63 P.3d at 520.  In his deposition testimony, however, Mr. Allen attempted to distinguish between the coverages by noting that the "med-pay component will pay . . . for injuries suffered in an automobile accident without regard to fault[, while] the underinsured motorist component is . . . liability-based." Allen Dep. 100:1-11.  Similarly, he described the underinsured motorist coverage restriction as "a legal-liability oriented reduction . . . . . It wouldn't include the med-pay, which is not fault based. *Id.* at 104:21-25.  Comparing MedPay to health insurance, he claimed his opinion was further verified by the collateral source rule:

> [T]hat rule says if I run over your foot causing you substantial medical expenses, it is my obligation as the tortfeasor to pay those medical expenses.  Whether or not you have health insurance is irrelevant.  Otherwise, by being reasonably wise and having health insurance, you would get less than if you were financially irresponsible and didn't.  That makes no sense.  So I cannot claim a credit because you had health insurance.
> This is fundamentally health insurance.  It's a different benefit.  A premium was paid for it.  It's due and owing. . . . So it's not duplicate payment for the same damages.  They are different damages.

*Id.* at 101:2-19.

Mr. Allen's opinion on this issue is clearly is contrary to New Mexico law.  Given "New Mexico's policy favoring full compensation of injured parties," underinsured motorist "policy provisions limiting an insured's recovery of damages have met with strong disfavor."  *Fickbohm*, 133 N.M. at 419, 418, 63 P.3d at 522, 521.  On the other hand, there is "the companion policy of discouraging recovery in excess of full compensation."  *Id.* at 419, 63 P.3d at 522. (citing *Schmick*,

---

[12]     Although the *Fickbohm* court found that the provisions there intended to specifically "prevent recovery for the *same medical damages* from both coverages," the Court does not find this distinction of import.  *See* 133 N.M. at 417, 63 P.3d at 520 (emphasis to "medical damages" added).

103 N.M. 216, 704 P.2d 1092).  Thus, "the 'combined amounts the insured recovers . . . can never

exceed the insured's total damages.'"  *Id.* (quoting *Schmick*, 103 N.M. 218 n.1, 704 P.2d. at 109

n.1).  Applying both policies, the *Fickbohm* Court allowed the medpay offset where "the offset

provisions are unambiguous[, and] the insureds are fully compensated for their damages."  *Id.*  This

is the case even though an insurer may not offset  "workmen's compensation law, disability benefits

law, or similar law."[13]  *Id.* at 418, 63 P.3d at 521  (quoting *Cont'l Ins. Co. v. Fahey*, 106 N.M. 603,

605, 747 P.2d 249, 251 (1987); *see also Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1341 (10th Cir.

1998) (citing New Mexico cases liberally construing statutory provisions on uninsured motorist

coverage by disallowing offsets of workers' compensation coverage).  Additionally, the payment

of separate premiums for both coverages does not bar offset between them, as long as the offset

provisions are unambiguous.  *Fickbohm*, 133 N.M. at 419, 63 P.3d at 522 (citing *Sanchez v.

Herrera*, 109 N.M. 155, 783 P.2d 465 (1989); *Chavez v. State Farm. Mut. Auto. Ins. Co.*, 87 N.M.

327, 533 P.2d 100 (1975)).  Furthermore, the collateral source rule is inapposite to circumstance

such as these, where

> the insurer[] is the proverbially the collateral source.  "No policy would be served
> by requiring [the insurer] to twice pay [plaintiff's] past medical expenses" . . . . In
> effect, the source must be "sufficiently collateral" or independent to assure an
> unwarranted double recovery has not occurred. . . . [T]he insurer's having already
> completely reimbursed plaintiff's past medical expenses should not be charged
> twice.

*Miera*, 143 F.3d at 1341 (quoting *Quinones v. Pa. Gen. Ins. Co.*, 804 F.2d 1167, 1171 (10th Cir.

1986)).  Thus, the collateral source rule is confined "to the tort-feasor who should not benefit from

the injured party's reimbursement from another source," not the insurer itself.  *Id.* (citing *Quinones*,

---

[13]    Although the Liberty Mutual policy apparently attempted to reserve its right to offset "other sources such
as workers' compensation, disability, or similar loss," the validity of such offsets is not at issue here.

804 F.2d at 1171).  Given that the Court has found Defendant's determination that Plaintiff had been

fully compensated was not made in bad faith, it also finds that Liberty Mutual's decision to offset

the MedPay, even if ultimately held to be erroneous, was arguably consistent with New Mexico law

and not unfounded or made in bad faith.

THE NEW MEXICO UNFAIR CLAIMS PRACTICES ACT

Liberty Mutual next moves for summary judgment on Ms. Hemphill's allegations that it

violated the New Mexico Unfair Claims Practices Act in its handling of her claim.  Ms. Hemphill

charges that Liberty Mutual violated the Act by

> (a) failing to acknowledge and act reasonably promptly upon communications with
> respect to claims from insureds arising under the Policy; (b) failing to adopt and
> implement reasonable standards for the prompt investigation and processing of
> insureds' claims arising under policies; (c) not attempting in good faith to effectuate
> prompt, fair and equitable settlements of an insured's claims in which liability has
> become reasonably clear; (d) failing to affirm or deny coverage of claims of insureds
> within a reasonable time after proof of loss requirements under the policy have been
> completed and submitted by the insured . . . ;[14] and (f) and [sic] compelling insured
> s to institute litigation to recover amounts due under the policy by offering
> substantially less than the amounts ultimately recovered in actions brought by such
> insureds when such insureds have made claims for amounts reasonably similar to
> amounts ultimately recovered.

Compl. ¶ 21.

The Trade Practices and Frauds Act of the Insurance Code prohibits unfair and deceptive

insurance practices by an insurer or other person, which are knowingly committed or performed with

such frequency as to indicate a general business practice.  N.M. STAT. ANN. § 59A-16-20.  A

violation of the Act "occurs for 'not attempting in good faith to effectuate prompt, fair and equitable

settlements of an insured's claims in which liability has become reasonably clear.'"  *Hovet v. Allstate*

*Ins. Co.*, 135 N.M. 397, 406, 89 P.3d 69, 78 (2004) (quoting N.M. STAT. ANN. § 59A-16-20E).  The

---

[14]   Plaintiff's claimed violation  "e)" is identical to that stated in part "c)."  *See* Compl. ¶ 21.

Insurance Code, however, "does not impose a duty to settle in all instances, nor does it require insurers to settle cases they reasonably believe to be without merit or overvalued." *Id.*   Rather, "[t]he insurer's duty is founded upon basic principles of fairness[, and an] insurer that objectively exercises good faith and fairly attempts to settle its cases on a reasonable basis and in a timely manner need not fear liability under the Code." *Id.*

       Liberty Mutual first contends that there is no evidence that it failed to acknowledge and act reasonably promptly upon communications with respect to Plaintiff's claims.  Defendant again points out that after receiving the demand letter on November 10, 2008, Travis Flower responded by letter on December 3, 2008, twenty-three days later, stating Liberty Mutual's position that Ms. Hemphill was fully compensated for her injuries by the total settlements she had received to date.

       Liberty Mutual next maintains that there is no evidence that it failed to adopt and implement reasonable standards for the prompt investigation and processing of Plaintiff's claims.  Defendant first notes that Plaintiff does not dispute that Liberty Mutual adopted adequate standards, as described in its bodily injury claims investigation handbook.  Def.'s Mot. Part. Summ. J. 4, UMF 3; Pl.'s Mem. Opp'n 5.  Additionally, while Plaintiff claims that Defendant failed to implement its standards because it did not put a value on Plaintiff's case, Liberty Mutual argues that it did value Plaintiff's claim - at less than $150,000, the total compensation Plaintiff already had received. Further, regarding Plaintiff's assertion that it did not follow industry standards by deciding the percentage of fault allocated to each tortfeasor, as Mr. Allen contends is always required, Liberty Mutual responds that Mr. Allen's opinion is unsupported by facts, studies, or data compilations and, therefore, is merely unsupported argument.

       Liberty Mutual also maintains that there is no evidence that it did not attempt in good faith to effectuate prompt, fair, and equitable settlements of Ms. Hemphill's claim, stating that it did not

act in bad faith in deciding Plaintiff's claim was worth $150,000 or less, given her medical expenses of $46,000, in offsetting German's and Browning's policies in valuing her claim, or in offsetting its MedPay payment.  Defendant additionally asserts that there is no evidence that it failed to affirm or deny coverage of Plaintiff's claim within a reasonable time after proof of loss requirements under the policy had been completed and submitted by Plaintiff, as it affirmed Plaintiff's coverage, but found her claim overvalued, in twenty-three days, which is a reasonable time as a matter of law.

Finally regarding the Unfair Claims Practice Act, Liberty Mutual insists that there is no evidence that it compelled Ms. Hemphill to institute litigation to recover the amounts due under the policy.  Defendant submits that the only evidence to support this claim is Mr. Allen's statement that Liberty Mutual "compelled litigation to recover amount due by offering nothing, substantially less than the amount due."  Def.'s Mot. Part. Summ. J. Ex. B. 2.  Defendant counters, however, that since Mr. Allen also surmised that the lowest reasonable value for Plaintiff's claim was about $90,000, although he indicated he would prefer starting at $150,000, and Liberty Mutual determined Plaintiff's total damages were $150,000 or less, even he cannot prove that it compelled this litigation by offering substantially less than the amount due.  Defendant further reasons that even if Mr. Allen had testified that Plaintiff's claim was worth substantially more than $150,000, his opinion would not be supported by reasoned quantitative or qualitative data, statistical analyses of prior judgments or similar settlements in New Mexico, but rather would be based on nothing more than generalities and assurances of his experience, and therefore would be unpersuasive.

In response, Plaintiff refers generally to Mr. Allen's report, *see* Notice Filing Exs. . . . to Pl.'s Resp. to Def.'s *Daubert* Mot. Exclude Testimony  Pl.'s Expert Garth Allen [Doc 71] Ex. 1 ("Allen Report"), and gives "[a] few examples" of alleged violations:  that Mr. Flowers told Plaintiff she could not pursue an underinsured motorist claim if she did not exhaust Mr. Browning's policy limits

19

and, without conducting a fair and proper evaluation of the claim, that she had been fully compensated by her settlements with Ms. German and Mr. Browning; that Liberty Mutual did not attempt in good faith to effectuate a prompt, fair and equitable settlement; and that Liberty Mutual's bald statement that Plaintiff was "fully compensated," with no explanation or analysis, as a practical matter compelled the Plaintiff to accept an unfair non-offer or bring a lawsuit. Pl.'s Mem. Opp'n 15. Plaintiff asserts that each of these examples are violations of the Unfair Claims Practices Act, including, but not limited to, §50A-16-20(A), (B), (C), (E), (G), and (N).[15]

Liberty Mutual replies that Plaintiff's Unfair Claims Practices claims are unsupported by material facts. It points out that although she listed some examples of conduct that allegedly violated the Act, only one of her examples is an actual "fact": that the claims adjuster told her that she could not pursue an underinsured motorist claim if she did not exhaust Mr. Browning's policy limits. Defendant admits that this fact is undisputed, but cites to another undisputed fact: that "[s]ubsequently [Mr. Flowers] told her that she could pursue a UIM claim even if she did not recover the full liability limits of $100,000." *See* Pl.'s Mem. Opp'n 7, Pl.'s AMF 18, 19; Def.'s Reply 2. Liberty Mutual maintains that while both of these facts are undisputed, they are immaterial because Plaintiff has not shown how this caused her any damage, as is required under New Mexico law. *See* NMUJI 13-1706 ("If defendant engaged in [a prohibited practice], it is liable to plaintiff for *damages proximately caused by its conduct* if it acted knowingly or engaged in the practice[s]

---

[15]    The Court notes that in her Complaint Plaintiff quoted directly from the language in the statute in stating her alleged unfair claims practices, which included subsections (B), (C), (D), (E), and (G). She now appears to have abandoned her claim under (D), "failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured," but apparently pursues additional claims under subsection (A), "misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue," and subsection (N), "failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." N.M. STAT. ANN. § 59A-16-20.

with such frequency as to indicate that such conduct was its general business practice.") (first alteration added) (emphasis added).  Defendant argues that not only are Plaintiff's other examples of violations under the Act only vague allegations, not specific facts, but also that she has offered no facts supporting proximate causation or showing general business practices.

The Court first feels compelled to comment that Plaintiff's response in support of her Unfair Claims Practices claims can be described only as minimal, at best.  She has made no attempt to identify what her claims are, but rather lists "[a] few examples," and refers only generally to Mr. Allen's report, also without providing any detail or explanation.  Indeed, she has provided no evidence, much less sufficient evidence, showing that a jury could return a verdict in her favor. Needless to say, Plaintiff's reliance on unspecified or unsupported and conclusory facts and opinions, is insufficient to withstand summary judgment on her Unfair Claims Practices claims.  The Court reminds counsel that it is not its job to organize and formulate a party's arguments, nor to "'scour the record in search of evidence to defeat a motion for summary judgment.'"[16]  *Hauff*, 755 F.3d at 1150 (quoting *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996)).

The Unfair Claims Practices Act prohibits an insurer from knowingly misrepresenting to the insured pertinent facts or policy provisions relating to the coverage at issue.  N.M. STAT. ANN. § 59A-16-20(A).  Although she did not bring a claim under this provision in her Complaint, Ms.

---

[16]    The Court also finds Plaintiff's "incorporations" between her response to this Motion and her response to Defendant's *Daubert* Motion to Exclude Testimony of Plaintiff's Expert Garth Allen totally unhelpful.  *Compare* Pl.'s Mem. Opp'n 3 n.1 ("Because of the great deal of overlap between many of the points presented in this Memorandum and those presented in the Response to the *Daubert* motion related to Garth Allen, Plaintiff hereby incorporates the facts and arguments made in Doc. 71 in this Memorandum rather than repeat them all."), *with* Pl.'s Resp. Def.'s *Daubert* Mot. . . . (Docket No. 71) at 2 n.1 ("Because of the great deal of overlap between many of the points presented in this Response and those presented in the Plaintiff's Memorandum in Opposition to Defendant's Motion For [sic] Summary Judgment . . . , Plaintiff hereby incorporates the facts, argumentsand [sic] Exhibits presented in that Memorandum into this Response rather than repeat them all.")  Plaintiff's response to the *Daubert* motion in no way cures the defects delineated here).  As is the case with her references to the Allen Report, Plaintiff makes no effort to refer the Court to any specific pages or material in either of her briefs.

Hemphill now asserts that Liberty Mutual violated this portion of the Act because Mr. Flowers told her she could not pursue her underinsured motorist claim unless she exhausted Mr. Browning's policy limits, Pl.'s Mem. Opp'n 7, Pl.'s AMF 18. As Defendant points out and Plaintiff acknowledges, Mr. Flowers subsequently corrected himself and informed her that she could pursue her claim even if she did not recover Mr. Browning's full liability limits. *See id.* Pl.'s AMF 19. Ms. Hemphill does not explain how the initial misrepresentation injured her. In reviewing Mr. Allen's report, the Court notes that he stated that Liberty Mutual misrepresented its policy "at a critical time," again without providing any factual or temporal background or an explanation of what the adverse effects on Plaintiff might have been. *See* Allen Report 5. This conclusory statement is insufficient to support this claim.[17]

Subsection B of the Act sanctions "failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies." N.M. Stat. Ann. § 59A-16-20(B). As discussed earlier, there is no evidence that Liberty Mutual responded to Plaintiff's demand in an untimely manner. Indeed, Plaintiff's expert found this to be the case.[18] *See* Allen Report 5 ("Liberty Mutual responded to the November 10, 2008 demand for payment in a timely manner . . . ."). To the extent Plaintiff seeks to assert under this provision of the Act that Liberty Mutual did not acknowledge or respond reasonably promptly to other communications, she has provided no evidentiary support for such a claim.

---

[17]    In his report Mr. Allen also discussed Liberty Mutual's offset of its MedPay benefits as a misrepresentation under the Act, but as Plaintiff does not mention such a claim, the Court deems it waived.

[18]    To the extent Plaintiff might have asserted an Unfair Claims Practices claim based on Mr. Allen's opinion that Defendant "unreasonably delayed the request for settlement with MetLife by . . . stating that the uninsured motorist claim would be lost if the full bodily injury liability limit were not recovered from MetLife," and that the legal opinion Liberty Mutual sought on this issue "should have been available in a more timely fashion," Allen Report 6, the Court deems it waived. Again, Plaintiff provides no factual basis for such a claim, enumerates no injury caused by any delay, and does not even mention in passing such a claim.

Plaintiff's Unfair Claims Practices claims under subsections (C) and (E)[19] appear to address whether Liberty Mutual implemented reasonable standards in investigating and processing her claim and exercised good faith in reaching a fair and equitable settlement.  In his report, Mr. Allen opines that because Liberty Mutual's adjusters did not follow the procedures set forth in its Bodily Injury Claims Investigation Handbook, use the company's Claim Outcome Advisor, or follow industry standards, as he set them forth, it did not properly investigate, process, or fairly and equitably settle Plaintiff's claim.  Allen Report 6-8.  As the Court previously has discussed, Liberty Mutual properly implemented New Mexico law in its determination that Plaintiff already had been fully compensated for her claim.   Clearly, Liberty Mutual considered Plaintiff's injuries and medical bills and necessarily determined the value of her claim to be $150,000 or less.  The Court does not believe that any insurer under circumstances such as these should have been required to conduct a more detailed investigation and allocate fault among the parties, as neither was required under New Mexico law.  Liberty Mutual's conduct in this regard, then, cannot be seen as unreasonable or undertaken in bad faith.

Ms. Hemphill's final example of a violation, that Liberty Mutual's statement that she was fully compensated, with no explanation or analysis, compelled her to accept "an unfair non-offer" or bring suit, apparently refers to subsections (G) and (N)[20] of the Act.  Again, Plaintiff's "example"

---

[19]    Subsections 59A-16-20(C) and (E), respectively, prohibit an insurer from knowingly "failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies," or "not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear."

[20]    Subsection 59A-16-20(G) and (N), respectively, proscribe an insurer from knowingly "compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered" or "failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

falls short.  Referring to her expert's report, the Court finds that Mr. Allen offers nothing more than his opinion that Liberty Mutual violated subsection (G), "compell[ing] litigation . . . by offering nothing, substantially less than the amount due."  Allen Report 8.  Mr. Allen does not support his conclusion with any evidence, much less quantitative or qualitative data, *cf. Hauff*, 755 F. Supp. 2d at 1149, and does not cite "actions brought by [other insureds who] have made claims for amounts reasonably similar to amounts ultimately recovered," as required by the Act, N.M. STAT. ANN. § 59A-16-20(G).  Thus, Plaintiff has offered no probative evidence that she was offered substantially less that similarly situated insureds recovered, compelling her to bring suit, and Defendant is entitled to summary judgment on this claim.[21]

Plaintiff's final claim under the Unfair Claims Practices Act seems to be that Defendant prevented negotiation and settlement of her claim by failing to provide a reasonable explanation of the basis of its decision, thereby violating subsection (G).  Allen Report at 8.  Again Mr. Allen asserts that Liberty Mutual should have computed and informed Plaintiff of "the allocation of fault and the basis for the allocation."  *Id.*  As the Court has determined, Liberty Mutual was not required under New Mexico law to determine the comparative fault of those involved in the accident in analyzing Plaintiff's underinsured motorist claim.  Furthermore, the Act imposes no duty on insurers to "settle in all instances," and insurers are not required "to settle cases they reasonably believe to be without merit or overvalued."  *Hovet*, 135 N.M. at 397, 89 P.3d at 78.  Given Plaintiff's failure to provide any evidence showing that Defendant did not exercise good faith and fairly attempt to settle this case on a reasonable basis and in a timely manner, the Court will grant summary judgment

---

[21]    The Court also notes that in its response to Plaintiff's demand, Liberty Mutual indicated its willingness to proceed through arbitration or mediation, in addition to indicating its willingness to further discuss her claim.  Def.'s Mot. Part. Summ. J. Ex. D.

24

to Liberty Mutual on this claim and all others brought by Plaintiff under the Unfair Claims Practices Act of the Insurance Code.

THE NEW MEXICO UNFAIR PRACTICES ACT

Lastly, Liberty Mutual moves for summary judgment on Plaintiff's New Mexico Unfair Practices Act claim. Ms. Hemphill alleges that Defendant violated this Act "in failing to deliver the quality or quantity of insurance contracted for by [her]." Compl. ¶ 22.

The Unfair Practices Act prohibits "[u]nfair or deceptive . . . and unconscionable trade practices." N.M. STAT. ANN. § 57-12-3. An unfair or deceptive trade practice includes "failing to deliver the quality or quantity of goods or services contracted for." *Id.* §57-12-2(D)(17). To show a violation of the Act, a plaintiff "must prove, among other things, that [the defendant] 'knowingly' made a false, misleading, or deceptive representation 'in connection with' the sale of services subject to the Act." *Hauff*, 755 F. Supp. at 1149 (quoting N.M. STAT. ANN. § 57-12-2(D)) ( citing *Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 811 P.2d 1308, 1311 (1991)).

Liberty Mutual moves for summary judgment on Plaintiff's Unfair Practices Claim on grounds that she has not provided any evidence that it failed to deliver the insurance Plaintiff purchased. Defendant notes that while Mr. Allen failed to express any opinion in his report that Liberty Mutual violated this Act, he did testify that it was his opinion that "Liberty Mutual failed to deliver the quality and quantity of goods and services purchased by the Hemphills." Def.'s Mot. Part. Summ. J., Ex. A 137:24-138:1. When asked the basis of this opinion, Mr. Allen responded, "Based on my analysis of the file." *Id.* at 138:3. Liberty Mutual contends that Mr. Allen's opinion, unsupported as it was by reference to any contract language, is insufficient as a matter of law to create a triable issue. *Hauff*, 755 F. Supp. 2d at 1149 (expert's deposition does not quote or describe any contractual language on which he based his opinion; therefore, expert's conclusions are

25

unsupported opinion and court disregards them) (citing *Matthiesen v. Banc One Mortg. Corp.*, 173

F.3d 1242, 1247 (10th Cir. 1999) (holding that unsupported conclusions of experts will not defeat

summary judgment)).

Plaintiff responds that her Unfair Practices Act claim "[e]ssentially centers" on [her]

argument that [underinsured motorist] coverage was paid for and not received." Pl.'s Mem. Opp'n

16. She then refers generally to the facts 'supporting [her] claim for breach of contract" as providing

support for her Unfair Practices Act claim, listing by number Additional Material Facts 24, 26, 27,

28, 35, 36, 37, 39, and 42, and Exhibit 11.[22] *Id.*

---

[22]   The facts Plaintiff cites to are:

24. Travis Flowers believed that New Mexico was a 51/49 comparative negligence state–meaning that the claimant can recover damages as long as they are not more than 50 percent at fault for an accident.
. . . .
26. When settling a property damage claim from Ms. LeBlanc, an unknown adjuster working for Prudential (a predecessor of Liberty Mutual) used a 50 per cent liability allocation on Ms. German.
27. On June 12, 2007, Travis Flowers received a voice message from MetLife advising him that "they are willing to pay for 50% of the damages and that although the clmt is still treating, they are investigating whether these injuries are accident related."
28. On June 20, 2007, Alice Parisot wrote Travis Flowers and said: "Travis, we need to address liability here also if the insured is 50% liable for their own injuries do they recover under UNBI? Who paid the 50%, the claimant behind us? Please indicate your liability determination. We need to obtain all of the meds regardless. Both combined, even if thy have 25k offer and 50k offer, still do not touch our UNBI limit and there is a potential exposure"
. . . .
35. Liberty Mutual's UIM policy provision states: "we will pay up to our Limit Of Liability for bodily injury . . . when an insured or an insured's car is struck by an uninsured or underinsured motor vehicle or trailer. Our payment is based on the amount that an insured is legally entitled to recover for bodily injury...but could not collect from the owner or operator of the uninsured or underinsured motor vehicle**."**
36. The UIM portion of the policy provides "The owner or operator responsible for the accident is underinsured when the bodily injury liability insurance ...has limits that are less than those amounts shown for this Part on your Declarations. The maximum amount payable by us shall not exceed the amount by which the limits of your Each Person Underinsured motorist Coverage exceeds the limits of the bodily injury insurance of the owner or operator of the underinsured motor vehicle.
37. After stacking of applicable UM/UIM coverage, Plaintiff had at least $1 million in coverage.
. . . .
39. Mr. Browning was insured by MetLife and had $100,000 in liability coverage.
. . . .
42. Mr. Browning's insurance defense counsel hired by MetLife estimated the allocation of fault for Plaintiff's injuries resulting from the accident as 25% on Mr. Browning and 75% on Ms. German. He also determined that Plaintiff bore no fault for having been rearended twice.

Liberty Mutual notes in its Reply that the facts upon which Plaintiff relies address allocation of fault, quote policy language, state policy limits for Ms. Hemphill and Mr. Browning, and state Mr. Browning's attorney's assessment of fault allocation.  Def.'s Reply 5.  Defendant discusses in some detail why it disputes Plaintiff's Material Facts 24 and 42 and questions how either could be found by a jury to be material to Plaintiff's Unfair Practices Act claim.  Def.'s Reply, 5-6.  In sum, Liberty Mutual contends that Plaintiff has failed to demonstrate how any of the facts, disputed or not, are material to her Unfair Practices Act claim or how they might affect the outcome of her lawsuit.

"The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." *Diversey Corp. v. Chem-Source Corp.*, 125 N.M. 748, 754, 965 P.2d 332, 338 (N.M. Ct. App. 1998) (citing § 57-12-2(D); *Stevenson,* 112 N.M. at 100, 811 P.2d at 1311).  Thus, there are four elements that a plaintiff must establish to invoke the Act:

> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation" that was either false or misleading.  Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or ... collection of debts." *Id.*  Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce.  *Id.*  Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." *Id.*

*Stevenson*, 112 N.M. at 100, 811 P.2d at 1311 (quoting *Ashlock,* 107 N.M. 100, 101, 753 P.2d 346, 347 (1988), *overruled on other grounds by Gonzales v. Surgidev Corp.*, 120 N.M. 133, 140, 899 P.2d 576, 583 (1995)) (internal quotation marks omitted).

---

Mem. Opp'n 8-10 (citations omitted).  The Court has reviewed the exhibits filed by Plaintiff in support of her Memorandum in Opposition and finds that there is no Exhibit 11.

The mere fact that Liberty Mutual may have failed to provide the quantity and quality of serves she purchased, as propounded by Ms. Hemphill, is insufficient to sustain a claim under the Unfair Practices Act. *Id.* at 99, 811 P.2d at 1310. Additionally, the facts supporting her breach of contract claim alone are not enough to establish violation of the Act. As the Stevenson Court pointed out, if this were to be the case, it "would result in every breach of contract case being a violation of the Act." *Id.* (". . . and every party found to have breached a contract by failure to deliver would be automatically liable for attorney fees and potentially liable for treble damages under Section 57–12–10 (Repl. Pamp.1987). We do not believe that the legislature intended such a result."). Thus, Plaintiff's Unfair Practices Act claim must fail.

WHEREFORE,

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Summary Judgment on Plaintiff's Claims of Breach of Contract, Bad Faith and Statutory Violations (Docket No. 52), filed January 30, 2012, is **GRANTED IN PART** and **DENIED IN PART**.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**